F I L E D
United States Court of Appeals
Tenth Circuit

JAN 12 2004

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

CHARLIE LEE; JEAN LEE; DON LEE, also
known as "Bebo"; LINDA DAVIS; JIMMIE
COODY; MARTHA COODY; BOB A.
JONES; ELIZABETH JONES; LAURA
JONES; ROBERT E. JONES, also known as
"Bobby"; PATRICIA JONES; A. S. ELLIOTT,
also known as "Tex"; JANNIFER ELLIOTT;
DWAYNE F. STEWART, also known as
"Slim"; ALVAREE R. STEWART; INNIS
LEWIS; BRYAN PRATHER; JUDY J.
PRATHER; LUCY JANE SCHAFER; JONNA
LOU SCHAFER; LINCOLN PERMITTEES'
ASSOCIATION, a non-profit organization on
behalf of itself and its members; and OTERO
COUNTY CATTLEMAN'S ASSOCIATION, a
non-profit organization on behalf of itself and
its members,

        Plaintiffs - Appellants,

      v.

UNITED STATES AIR FORCE; F. WHITTEN
PETERS, Secretary of the United States Air
Force; BRIGADIER GENERAL LAKE,
Commander, 49th Fighter Wing, Holloman Air
Force Base; UNITED STATES
DEPARTMENT OF DEFENSE; WILLIAM S.
COHEN, Secretary of Defense, acting for the
GERMAN AIR FORCE and COLONEL
ECKARD SOWADA,

        Defendants - Appellees.

No. 02-2306

Frank M. Bond (Faith Kalman Reyes with him on the briefs), The Simons Firm, LLP, Santa Fe, New Mexico, for Plaintiffs - Appellants.

Joseph D. Jacobson, Lt. Col., United States Air Force, Arlington, Virginia (David C. Iglesias, United States Attorney, Albuquerque, New Mexico; Raymond Hamilton, Assistant United States Attorney, Albuquerque, New Mexico; Charles C. Killion, Major, Special Assistant United States Attorney, United States Air Force, Arlington, Virginia; Kenneth M. Theurer, Major, United States Air Force, Arlington, Virginia, on the brief) for Defendants - Appellees.

Before **TACHA,** Chief Circuit Judge, **ANDERSON** and **HENRY**, Circuit Judges.

**ANDERSON**, Circuit Judge.

This case involves an environmental law challenge to United States Air Force ("U.S. Air Force") plans to permit the German Air Force to station, for training purposes, thirty fighter aircraft at Holloman Air Force Base ("Holloman"), in addition to the twelve already there. The suit was brought by ranchers and livestock raising associations (referred to collectively as "Appellants") located near Holloman, claiming, among other things, multiple violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-70f, by the U.S. Air Force, the Department of Defense, and various U.S.

Air Force and Department officials.[1]  The district court affirmed the U.S. Air Force's final agency decision on the grounds that it was "neither arbitrary, capricious, nor without reasonable foundation."  Lee v. U.S. Air Force, 220 F. Supp. 2d 1229, 1249 (D.N.M. 2002).

On appeal, Appellants argue that the U.S. Air Force, in carrying out the procedures required under NEPA to assess the environmental impact of its proposed action, failed to consider reasonable alternatives, failed to assess adequately the potential impact on property values in surrounding areas, used a flawed methodology to analyze noise impacts, used outdated studies to assess livestock impacts, and failed to consider the impact of aerial refueling or the potential secondary effects of aircraft accidents.  They further argue that the U.S. Air Force's agreement with the German Federal Ministry of Defense ("German Defense Ministry") to expand German Air Force training at Holloman is invalid because the U.S. Air Force did not follow the procedural requirements imposed by the Case-Zablocki Act, 1 U.S.C. § 112b, for international agreements.

---

[1]We will refer to these parties in their stance as appellees collectively as "the U.S. Air Force," relying on context to clarify whether the agency or the appellees are intended.

# BACKGROUND

Holloman is located in southern New Mexico, approximately seven miles west of Alamagordo and eighty-five miles northeast of El Paso, Texas. The base is adjacent to the White Sands Missile Range as well as White Sands National Monument. The United States and Germany began negotiations to establish the German Air Force training program at issue here in 1992. Initially, the United States offered to allow the beddown of up to forty-two German Air Force Tornado PA-200 aircraft at Holloman. However, "[d]ue to political considerations and funding limitations, the GAF [(German Air Force)] decided to pursue the program in two stages–Holloman I and Holloman II." Appellants' App. at 336b. In the Holloman I stage, the German Air Force would move twelve Tornados to Holloman, to be followed by thirty additional Tornados in the Holloman II stage.

Before giving final approval to an agreement finalizing these negotiations, the U.S. Air Force analyzed the environmental impact of its proposed action in an environmental assessment ("EA"), issued in February 1993. The EA considered only the impact of Holloman I and concluded that there would be no significant environmental impact. The U.S. Air Force thus issued a finding of no significant environmental impact ("FONSI"), which allowed it to avoid preparing a more detailed environmental impact statement ("EIS").

-4-

Subsequently, on May 20, 1994, the U.S. Air Force and the German Defense Ministry signed a Memorandum of Agreement ("Agreement") implementing Holloman I. The Agreement authorized a German Air Force Tactical Training Establishment ("TTE") at Holloman and provided for the beddown of twelve Tornados, accompanied by German Air Force personnel. The twelve Tornados were relocated to Holloman in May 1996.

According to U.S. Air Force documents in the administrative record, the German Air Force identified a need for additional low-altitude flight training after the beddown occurred, in the course of preparing specific Tornado mission training plans. Appellees' Supp. App. at 25. This, in combination with the need to "compensate for increasingly limited access to White Sands Missile Range . . . restricted airspace," id., led the U.S. Air Force to consider modifying Holloman's existing military training routes (MTRs) and military operations areas (MOAs) and establishing an oval aerial refueling track. Under its proposal, the U.S. Air Force would convert rarely-used air-launched cruise missile routes into routes for low-altitude (down to 100 feet above ground level) military aircraft training, and establish a new MOA, with operating altitudes as low as 300 feet above ground level, south of the existing MOA area. The U.S. Air Force prepared an EA and issued a FONSI in connection with this proposal in June 1997.

FAA approval of these airspace modifications was pending when, in May 1998, the U.S. Air Force and the German Defense Ministry amended their 1994 Agreement in order to implement the Holloman II stage. The amendments indicated that the German Air Force TTE at Holloman would be expanded through the beddown of thirty additional German Air Force Tornados and a substantial increase in the number of permanent German Air Force training and logistics personnel. Appellants' App. at 344. Under the expansion, Tornado aircrews could participate in five different training courses that would include training in takeoffs and landings, the use of terrain-following radar for low-level navigation on MTRs, air-to-ground training, air-intercept training, and aerial refueling. The amended Agreement indicated that its implementation was subject to a final decision by the U.S. Air Force following completion of the NEPA process. Id.

The U.S. Air Force decided to analyze the environmental impact of the German Air Force TTE expansion by preparing a full EIS. An April 1997 U.S. Air Force document suggests that an EIS was necessary "in order to identify a potential new bombing site" because the Tornado air-to-ground training contemplated by the proposed expansion would increase the number of practice bombings to several thousand per year. Id. at 336b. The EIS considered three options for a new target complex ("NTC") to accommodate the proposed increase in practice bombings. The new NTC, if established, would be used for bombings

using inert or subscale munitions while live munitions deliveries would continue to be restricted to the Red Rio Live Drop Target on the White Sands Missile Range. The preferred option was to construct the NTC on the West Otero Mesa portion of McGregor Range. The other options were to construct the NTC on the Tularosa Basin portion of McGregor Range or to use only existing ranges. Because the FAA had not yet approved the airspace modifications assessed in the 1997 EA, the EIS took into account the different impacts that would result depending on whether or not the modifications were implemented. In addition, the EIS considered a no-action alternative, under which the German Air Force TTE expansion would not occur. Appellees' Supp. App. at 45.

The U.S. Air Force solicited public comments on the proposed expansion at public hearings held during the initial EIS scoping process and through written announcements after the draft EIS was released in June 1997. A final EIS was completed in April 1998. On May 29, 1998, the U.S. Air Force gave final approval to the German Air Force TTE expansion and the preferred West Otero Mesa training option in a Record of Decision ("ROD"), explaining that although the no-action alternative would result in the minimum environmental impact, it "would not provide the training, proficiency, and combined action capabilities needed to achieve the military-to-military strategy and goals." Id. at 214. The existing range option would provide only "minimally adequate training for GAF

aircrews . . . . [and] has the potential to significantly degrade current U.S. Air Force operations and training." Id. In contrast,

> [t]he West Otero Mesa training option provides the maximum training opportunity for both the GAF and the U.S. Air Force. In addition to the greater opportunity for training, this option also provides for the greatest training versatility and efficiency. Finally, NTC construction on the West Otero Mesa will disturb a significantly smaller geographical area compared to the Tularosa Basin training option and will involve a fraction of the cost.

Id. at 213. The ROD described the potential environmental impacts of the decision, including "increased aircraft-related noise in some portions of the affected airspace, overflight disturbance to land use, and slight to moderate impacts to biological resources" but concluded that mitigation measures would likely "avoid or adequately minimize these potential impacts." Id. at 214.

As indicated above, Appellants challenged the U.S. Air Force's ROD as a final agency action, pursuant to the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701-06, and alleged violations of NEPA and the Case-Zablocki Act. In support of their NEPA claims, Appellants offered three expert affidavits that were not part of the administrative record. One of these, by Mr. Armand Smith, was offered to support Appellants' assertion that the EIS should have included a concrete appraisal of the potential decrease in property values resulting from the proposed action. Two others, by Dr. William J. Weida and Dr. Karl D. Kryter, were offered to support Appellants' argument that the U.S. Air Force used a

-8-

flawed methodology in performing its analysis of noise impacts resulting from the proposed action.

The district court first held that these expert affidavits were not eligible for admission into evidence.[2] The district court then rejected Appellants' claims, holding that the U.S. Air Force's final EIS complied with NEPA and that Appellants had no standing to claim a violation of the Case-Zablocki Act.[3] Appellants brought this appeal challenging all three of these holdings.

**DISCUSSION**

When reviewing agency action, we accord no deference to the district court's decision. Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv., 297 F.3d 1012, 1021 (10th Cir. 2002); Webb v. Hodel, 878 F.2d 1252, 1254 (10th Cir. 1989). Rather, we apply "the same standard of review to the [administrative] record as did the district court." Utahns for Better Transp. v. U.S. Dep't of Transp., 305 F.3d 1152, 1164 (10th Cir. 2002), modified, 319 F.3d 1207 (10th

---

[2]The district court granted the Government's motion to strike extra-record declarations in an August 27, 2002, memorandum opinion and order. Appellants' App. at 59.

[3]The district court dismissed Appellants' claim under the Case-Zablocki Act and its implementing regulations in a second memorandum opinion and order dated August 27, 2002. Appellants' App. at 56. In the same order, the court also dismissed Appellants' claim that the German Air Force's navigation of United States airspace violated the Federal Aviation Act. The court denied Appellants' NEPA claim in a published memorandum opinion. Lee, 220 F. Supp. 2d at 1231.

Cir. 2003). The APA "empowers a reviewing court to hold unlawful and set aside [final] agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Id. (citing 5 U.S.C. § 704). This standard "is a deferential one; administrative determinations may be set aside only for substantial procedural or substantive reasons." Id.

We consider Appellants' NEPA and Case-Zablocki claims in turn below. Because Appellants' claim in regard to their extra-record submissions is closely tied to their NEPA challenge, we consider that claim in the course of our NEPA discussion.

**A. NEPA Claim**

The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-70f, "prescribes the necessary process" by which federal agencies must "take a 'hard look' at the environmental consequences" of their proposed actions. Utahns for Better Transp., 305 F.3d at 1162-63. For proposed "major Federal actions significantly affecting the quality of the human environment," agencies must prepare an environmental impact statement ("EIS") in which they consider the environmental impact of the proposed action and compare this impact with that of "alternatives to the proposed action." See 42 U.S.C. § 4332(2)(C). Agencies "need not prepare a full EIS," however, if they initially prepare the less detailed

environmental assessment ("EA") and, based on the EA, issue a "finding of no significant impact" ("FONSI"), concluding that the proposed action will not significantly affect the environment. S. Utah Wilderness Alliance v. Norton, 301 F.3d 1217, 1237 (10th Cir. 2002), cert. granted, 72 U.S.L.W. 3105, 3299, 3307 (U.S. Nov. 3, 2003) (No. 03-101) (internal quotation marks omitted).

The infusion of NEPA's "'action-forcing' procedures" into the ongoing programs and actions of the federal government serves two related goals: By requiring agencies to gather and consider "detailed information concerning significant environmental impacts," it "ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 348-49 (1989). In addition, by making the relevant information available to the public, it both assures the public that the agency "'has indeed considered environmental concerns in its decisionmaking process'" and, "perhaps more significantly, provides a springboard for public comment." Id. (quoting Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 97 (1983)).

However, it is well established that NEPA "does not mandate particular results," Utahns for Better Transp., 305 F.3d at 1162 (citing Robertson, 490 U.S. at 350-51), nor does it require agencies "to elevate environmental concerns over

other valid concerns," id. at 1162-63 (citing Balt. Gas & Elec., 462 U.S. at 97).

Because NEPA imposes procedural rather than substantive requirements, "[t]he role of the courts in reviewing compliance with NEPA is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious." Id. at 1163 (internal quotation marks omitted). "We apply a rule of reason standard (essentially an abuse of discretion standard) in deciding whether claimed deficiencies in a [final] EIS are merely flyspecks, or are significant enough to defeat the goals of informed decisionmaking and informed public comment." Id.; see also Custer County Action Ass'n v. Garvey, 256 F.3d 1024, 1035 (10th Cir. 2001), cert. denied, 534 U.S. 1127 (2002).

As indicated above, Appellants object to the U.S. Air Force's EIS on a number of grounds. We address each of these grounds in turn.

### 1. Consideration of Alternatives

NEPA requires an EIS to include discussion of "alternatives to the proposed action." 42 U.S.C.§ 4332(2)(C)(iii). Appellants argue that the final EIS did not comply with this requirement because it failed to discuss air force bases other than Holloman as alternative sites for the German Air Force TTE expansion. According to Appellants, "[t]here is no legitimate reason why other bases could

not be considered for the beddown of the combined 42 Tornado aircraft."

Appellants' Br. at 17. Appellants also argue that the U.S. Air Force's initial

decision, in 1992, "to beddown a small number of aircraft [was made in order] to

avoid having to prepare an initial EIS" so that the U.S. Air Force could establish

as a "foregone conclusion" the premise that any additional German Air Force

aircraft would also be bedded down at Holloman. Id. In response, the U.S. Air

Force argues that "no other base was considered" because "[n]o other base was

reasonable," and that this was just as true in 1992 as it was in 1998. Appellees'

Br. at 11.

The consideration of alternatives to a proposed action is "the heart of the

environmental impact statement." 40 C.F.R. § 1502.14; see Colo. Envtl.

Coalition v. Dombeck, 185 F.3d 1162, 1174 (10th Cir. 1999); Ass'ns Working for

Aurora's Residential Env't v. Colo. Dep't of Transp., 153 F.3d 1122, 1130 (10th

Cir. 1998); All Indian Pueblo Council v. United States, 975 F.2d 1437, 1444 (10th

Cir. 1992). However, NEPA does not require an agency to analyze "the

environmental consequences of alternatives it has in good faith rejected as too

remote, speculative, or . . . impractical or ineffective." Id. at 1444 (internal

quotation marks omitted); see also Citizens Against Burlington, Inc. v. Busey,

938 F.2d 190, 194-95 (D.C. Cir. 1991) ("'[T]he term "alternatives" is not self-

defining.' . . . [D]iscussion [of alternatives] must be moored to 'some notion of

feasibility.'" (quoting Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 551 (1978))).

Thus, Council on Environmental Quality (CEQ) regulations implementing NEPA require agencies to "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a) (emphasis added). U.S. Air Force regulations[4] further specify that "'[r]easonable' alternatives are those that meet the underlying purpose and need for the proposed action and that would cause a reasonable person to inquire further before choosing a particular course of action." 32 C.F.R. § 989.8(b).

Here, we conclude that the U.S. Air Force's decision to eliminate other bases from consideration in the 1998 EIS was not unreasonable in light of the stated purpose and need for the German Air Force TTE expansion. The EIS explains that the proposed action is intended "to further support" the 1994 Agreement between the U.S. Air Force and the German Defense Ministry, to "demonstrate[] continued U.S. commitment to NATO allies" despite the reduction of a U.S. military presence in Europe, to "capitalize[] on the substantial infrastructure investments the GAF has already made at Holloman," to "provide[]

_____

[4]The U.S. Air Force regulations are meant to "achieve and maintain compliance with NEPA and the [CEQ] Regulations." 32 C.F.R. § 989.1(b). Thus, the U.S. Air Force must comply with both U.S. Air Force and CEQ regulations when undertaking the procedures required by NEPA. See id.

-14-

a desert/mountainous terrain training location not otherwise available to GAF aircrews in Germany," and to "allow Tornado expertise to be shared among students in different courses [in order] to enhance the training environment and produce better-trained students."[5]  Appellees' Supp. App. at 69-70.  In effect, the proposal at issue in 1998 was the expansion of the German Air Force TTE at Holloman, pursuant to the amended Agreement.  As such, it was not unreasonable for the U.S. Air Force to confine its consideration of alternatives to those available at Holloman.

While Appellants argue that the U.S. Air Force should have separated its analysis of alternative sites for a new NTC from those available for the German Air Force TTE expansion, it is clear that the U.S. Air Force considered the new NTC to be part of the proposed expansion and in fact the aspect of the expansion that made an EIS necessary.  The U.S. Air Force's limitation of its NTC alternatives to those available at Holloman therefore did not violate NEPA.

The record does not support Appellants' further assertion that the U.S. Air Force decision to bed down only twelve Tornados at first allowed it to circumvent NEPA's requirement to consider alternatives by preparing an EA instead of an

---

[5]We reject for lack of merit Appellants' argument that, in light of the lack of involvement of many of these NATO allies in the current military presence in Iraq, the U.S. Air Force's stated purpose of maintaining military cooperation with NATO allies is "flawed."  Appellants' Reply Br. at 4-5.

EIS.  Indeed, U.S. Air Force regulations note that the obligation to discuss

reasonable alternatives "applies equally to EAs and EISs."  32 C.F.R. § 989.8(c).

In connection with this obligation, the regulations further state that the U.S. Air

Force may "expressly eliminate alternatives from detailed analysis, based on

reasonable selection standards (for example, operational, technical, or

environmental standards suitable to a particular project)," as long as these

standards are not "so narrowly define[d] . . . that they unnecessarily limit

consideration to the proposal initially favored by proponents."  Id. § 989.8(c).

In accord with these regulations, the 1992 EA eliminated bases other than

Holloman from detailed analysis.  It explained, in a "history of the formulation of

the alternatives," that the U.S. Air Force identified Holloman as the only feasible

site for the potential twelve-Tornado beddown through a "narrowing process,"

based on the following criteria:

> The airbase must be an existing active duty base with facilities such
> that construction would be held to a minimum, both to keep costs to a
> minimum and to allow for rapid start-up.  Facilities needed . . .
> would include sufficient available ramp space for parking, buildings
> for work space and maintenance, and available housing for
> personnel.  As pilots . . . would require tactical training, suitable air-
> to-air and air-to-ground ranges should be near the base.  Also, as . . .
> training would involve bringing personnel to the U.S. for a short
> time, the flying environment should allow for the maximum number
> of flying days uninterrupted by weather. . . .  In addition to the above
> criteria, the GAF requested that Holloman AFB, New Mexico
> specifically be evaluated due to it being the beddown location for an

existing GAF F-4 training unit[6] and its proximity to German Army training conducted at Fort Bliss in El Paso, Texas.

Appellees' Supp. App. at 18. As described in the EA, the U.S. Air Force eliminated other air force bases as alternatives because those bases were already operating near full capacity, their use would require extensive construction to accommodate the German Air Force, they were located in areas where weather would significantly curtail the number of days available for training, or they were scheduled for closure. Id. at 19. Although Holloman, the preferred site, turned out to be the only feasible site, the criteria used by the U.S. Air Force to make this determination appear reasonable, and there is no indication that the U.S. Air Force unnecessarily eliminated other bases as alternatives.

The 1998 EIS refers back to this initial decisionmaking process. Id. at 94. Significantly, we find no indication in the record that the U.S. Air Force's conclusion in 1992 that Holloman was the only feasible site for the initial beddown would have been different if the U.S. Air Force had considered the beddown of forty-two Tornados rather than twelve. Further, there is no indication that new potential sites meeting the U.S. Air Force's criteria had become available by the time of the 1998 EIS. Under these circumstances, the fact that

---

[6]This German Air Force F-4 training unit was relocated at Holloman in 1992, due to the closure of George Air Force Base, its previous site. See Appellants' App. at 331; Appellees' Supp. App. at 43. An EIS was completed to assess the environmental impact of this relocation. Appellants' App. at 331.

-17-

the U.S. Air Force approved the establishment of a German Air Force TTE in a series of stages rather than in a single stage does not indicate that the U.S. Air Force circumvented NEPA's requirements.

Appellants urge us to find this situation analogous to that in Davis v. Mineta, 302 F.3d 1104 (10th Cir. 2002). In Davis, we held that an agency's decision to issue a FONSI rather than prepare an EIS was arbitrary because the agency had obligated itself contractually to issue a FONSI before it conducted an EA, making it clear that the agency had "prejudged the NEPA issues." Id. at 1112. Here, in contrast, the U.S. Air Force did not sign the original Agreement with the German Defense Ministry until after it had completed the 1992 EA and issued a FONSI. The 1994 Agreement only obligated the U.S. Air Force to accept a beddown of twelve Tornados. The 1998 amended Agreement explicitly stated that it would not go into effect unless the U.S. Air Force approved the action following completion of all NEPA requirements. There is thus no indication here that the U.S. Air Force prejudged the NEPA issues.

We therefore hold that the 1998 EIS's limitation of its alternatives analysis to those available at Holloman does not violate NEPA.

## 2. Consideration of Impacts

Appellants' remaining NEPA-related arguments concern the EIS's impacts analysis. NEPA requires an EIS to include an analysis of "the environmental impact of the proposed action," 42 U.S.C. § 4332(2)(C)(i), including ecological, aesthetic, historical, cultural, economic, social, and health impacts, whether direct, indirect, or cumulative, 40 C.F.R. § 1508.8. We address each of the alleged deficiencies in the EIS's impacts analysis below.

## a. Economic Impacts

First, Appellants challenge the EIS's assessment of economic impacts. They specifically contest its "conclusory determination" that any changes in value of rural properties surrounding Holloman due to the increased overflights accompanying the proposed German Air Force TTE expansion were impossible to quantify. They argue that the U.S. Air Force should at least have attempted to assign a dollar value to these changes, or discussed other failed attempts, before concluding that quantification was impossible.

The final EIS's discussion of the proposed action's potential impact on land values was included in response to public comments raising the issue. The EIS noted that, in the rural Holloman surroundings, "changes in daily aircraft overflight may or may not be readily discernible to the ground-based observer,"

and even "[w]here such changes can be discerned, existing variability in land value due to locations and improvements make it impossible to quantify any potential difference that might be associated with aircraft overflight." Appellants' App. at 156. The EIS concluded that "given the rural nature of the area and the relatively sporadic nature of overflights, changes in overflight would not be expected to produce measurable impacts on the economic value of the underlying land." Id. The EIS did not cite specific scientific support for the assertion that changes in land value were "impossible to quantify." Rather, it referred to "documentation" from "some locations [in the United States], particularly around airports," where changes in land value resulting from increased overflights had been difficult to quantify.

Under the circumstances here, we do not believe the EIS's treatment of the land valuation issue constituted a violation of NEPA, despite the EIS's failure to cite by name or discuss in detail the "documentation" it relied on for its conclusion that valuation was impossible. An agency's obligation in regard to "incomplete or unavailable information" is governed by the CEQ regulations.[7] 40

---

[7]We note that the district court failed to refer to 40 C.F.R. § 1502.22 when analyzing this issue. Rather, it relied on our prior decision in Environmental Defense Fund, Inc. v. Andrus, 619 F.2d 1368, 1375 (10th Cir. 1980), for the proposition that an agency need not discuss environmental effects in detail unless the effects can be "readily ascertained." The court also quoted the Fifth Circuit's statement in Sierra Club v. Sigler, 695 F.2d 957, 973 (5th Cir. 1983), that an EIS

(continued...)

C.F.R. § 1502.22. An agency "must obtain and include in the EIS information on 'reasonably foreseeable significant adverse impacts'" that are essential to a reasoned choice among alternatives "if the costs of obtaining such information are not exorbitant." Holy Cross Wilderness Fund v. Madigan, 960 F.2d 1515, 1523 (10th Cir. 1992). "If the costs of obtaining the information are exorbitant 'or the means to obtain it are not known' the agency must follow four specific steps." Id. (referring to the four steps outlined in 40 C.F.R. § 1502.22(b)). These steps include the obligation to summarize "existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts." 40 C.F.R. § 1502.22(b)(3). Again, however, these steps are only required in regard to "reasonably foreseeable significant adverse impacts." Id. § 1502.22(b).

Here, it is clear from the record that the U.S. Air Force did not consider decreased land values a reasonably foreseeable significant adverse impact; rather, it concluded that no measurable decrease in land values was likely to occur. The evidence in the record supports this conclusion. The EIS indicates that implementation of the proposed action would increase the average number of

---

[7](...continued)
need do no more than disclose the presence of uncertainty as to environmental consequences in order to comply with NEPA. However, both Sierra Club, id., and our own cases subsequent to Environmental Defense Fund, see Colo. Envt'l Coalition, 185 F.3d at 1172; Holy Cross Wilderness Fund v. Madigan, 960 F.2d 1515, 1523 (10th Cir. 1992), make clear that 40 C.F.R. § 1502.22 properly governs this analysis. See also Robertson, 490 U.S. at 354.

-21-

daily sorties flying out of Holloman from fifty-nine to seventy-six, and the number of touch-and-go operations and low approaches from 112 to 157 per day. This would result in an increase in the daily use of each MTR and MOA of between one and three sorties per day. Appellants' App. at 130. An MTR's width, which may be sixty or more miles, would further disperse the impact of the increased use. Id. at 156. While Appellants note that noise levels over some private land would reach 80 dB, they do not specify the nature of this land's current use, and the record shows that the noise in those areas was already at the 75 dB level without the proposed action. Id. at 132. We hold that the U.S. Air Force's conclusion that the proposed action's impact on property values was minimal does not violate the rule of reason. The U.S. Air Force was therefore not obligated to take the further steps required under 40 C.F.R. § 1502.22. See Colo. Envt'l Coalition, 185 F.3d at 1172 (holding that the Forest Service had no obligation under 40 C.F.R. § 1502.22 to obtain unavailable information that was not "'essential' to reasoned decision making").

Appellants argue that the affidavit of Mr. Armand Smith, a professional real estate appraiser, compels a contrary conclusion. We disagree. As indicated above, Mr. Smith's affidavit is part of the extra-record evidence that the district court held inadmissible. While judicial review of agency action is normally restricted to the administrative record, we have recognized that consideration of

extra-record materials is appropriate in "extremely limited" circumstances, such as where the agency ignored relevant factors it should have considered or considered factors left out of the formal record. Am. Mining Cong. v. Thomas, 772 F.2d 617, 626 (10th Cir. 1985). To be sure, where, as is often the case in the NEPA context, we are faced with an agency's technical or scientific analysis, an initial examination of the extra-record evidence in question may aid us in determining whether these circumstances are present. As a number of other circuits have explained, such an initial review may illuminate whether "an EIS has neglected to mention a serious environmental consequence, failed adequately to discuss some reasonable alternative, or otherwise swept stubborn problems or serious criticism . . . under the rug." Or. Natural Res. Council v. Lowe, 109 F.3d 521, 526-27 (9th Cir. 1997) (internal quotation marks omitted); accord Sierra Club v. Peterson, 185 F.3d 349, 370 (5th Cir. 1999), vacated on other grounds on reh'g, 228 F.3d 559 (5th Cir. 2000); Valley Citizens for a Safe Env't v. Aldridge, 886 F.2d 458, 460 (1st Cir. 1989); Suffolk County v. Sec'y of Interior, 562 F.2d 1368, 1384-85 (2d Cir. 1977); see also Sabine River Auth. v. U.S. Dep't of Interior, 951 F.2d 669, 678 (5th Cir. 1992).

Here, neither the record nor an initial review of Mr. Smith's affidavit convinces us that there are gaps or inadequacies in the EIS that would make admission of extra-record evidence appropriate. Mr. Smith asserts that "[l]ands

beneath an MTR . . . may suffer a loss in value," that "it is not difficult to calculate the decrease in land value as a result of overflights," and that the decrease in value would occur regardless of the number of overflights or their sporadic nature. Appellants' App. at 396-97. In essence, Mr. Smith simply presents an expert opinion conflicting with the U.S. Air Force's conclusion that a decrease in value is not reasonably foreseeable. It is well established that "'agencies are entitled to rely on their own experts so long as their decisions are not arbitrary and capricious.'" Custer County, 256 F.3d at 1036 (quoting Colo. Envtl. Coalition, 185 F.3d at 1173 n.12). We therefore affirm the district court's order to strike this affidavit as extra-record evidence.

### b. Noise Impacts

Appellants cite a string of alleged deficiencies in the EIS's noise analysis, including, for example, use of outdated methodology and data, reliance on computer-based simulation programs rather than actual measurement on the ground, failure to take into account the rural nature of the area, failure to distinguish between MOAs and MTRs when assessing impacts, considering 65 dB rather than 55 dB the threshold for significant noise impact on humans, and considering 80 dB an acceptable noise level for livestock. Appellants' Br. at 23-28.

We believe, however, that the noise analysis in the EIS is adequate. As explained in the EIS, the U.S. Air Force used three different noise metrics to analyze the noise impact of the proposed action. Appellees' Supp. App. at 118. It used the maximum sound level ("$L_{max}$") metric (measuring the maximum noise an aircraft would produce when flying directly overhead) and the Sound Exposure Level ("SEL") metric (combining the maximum sound level with the duration of the overflight noise) to tabulate the noise typically produced by the five major types of aircraft used at Holloman in a single overflight at different flight altitudes. Id. at 119. It then used the Onset Rate Adjusted Monthly Day-Night Average Sound Level ("$L_{dnmr}$") metric to assess the overall noise impact produced by the proposed expansion at Holloman. This metric makes adjustments to take into account increased noise impacts during the night or due to the "startle effect" of high-speed, low-altitude fighter aircraft flights. The U.S. Air Force computed $L_{dnmr}$ by means of a MRNMAP computer-simulation noise model, using measured aircraft noise collected by the Department of Defense for such purposes together with Holloman's projected training schedules for the proposed action. Id. at 125. The EIS cites studies published in 1995 and 1996 that validate the reliability of such aircraft noise model predictions. Id. at 127.

The EIS explains its choice of 65 dB as the noise threshold for humans by noting that this threshold is typically used for assessing noise impacts on

-25-

residential areas around airports. Id. at 131. Despite this conclusion, the EIS does, in its section on land use impacts, discuss the impact of noise increases that do not reach this threshold. Id. at 144-53; see also id. at 132-33 (indicating the proposed action's noise impacts throughout the entire region). The EIS also notes one area, the McGregor Range Restricted Area R-5103, where noise levels would reach a maximum $L_{dnmr}$ of 80 dB. Id. at 153. However, it explains that humans would be denied access to this area while this occurred and that this level is considered compatible with livestock uses under the Air Installations Compatible Use Zone (AICUZ) guidelines. Id. The latter conclusion is supported by studies cited in the EIS's Appendix J. Appellants' App. at 203.

We repeat that "'agencies are entitled to rely on their own experts so long as their decisions are not arbitrary and capricious.'" Custer County, 256 F.3d at 1036 (quoting Colo. Envt'l Coalition, 185 F.3d at 1173 n.12). Neither the noise analysis methodology used in the EIS nor the EIS's assertions regarding the noise threshold levels for humans and livestock are arbitrary or capricious. We have previously referred to the SEL and $L_{dnmr}$ metrics as "well-established and widely accepted" methodologies and upheld their use by the FAA and Air National Guard. Id., at 1035; see also City of Bridgeton v. FAA, 212 F.3d 448, 459 (8th Cir. 2000) (upholding the FAA's use of cumulative noise data); Communities, Inc. v. Busey, 956 F.2d 619, 624 (6th Cir. 1992) (same); Citizens Against

-26-

Burlington, 938 F.2d at 200 (upholding the FAA's use of SEL and $L_{dnmr}$ data); Davison v. Dep't of Defense, 560 F. Supp. 1019, 1028-29 (S.D. Ohio 1982) (upholding the U.S. Air Force's use of computer-simulated average noise levels although recognizing that this methodology did not account for the impact of a significant increase in nighttime flights).

Appellants have not met their burden of convincing us to do otherwise here. The extra-record affidavits of Dr. Weida and Dr. Kryter, stricken by the district court as indicated above, along with rebuttal affidavits that have been submitted by the U.S. Air Force, indicate that there is disagreement regarding the reliability of the methodology and whether it has been applied accurately in this EIS. This only demonstrates that experts disagree, which, as discussed above, is an insufficient basis for admitting extra-record evidence or for holding an EIS inadequate. We therefore affirm the district court's decision to strike these affidavits.

We hold that the EIS's discussion of changes in noise levels and the effects of these changes on land use provides the requisite basis for informed public comment and informed decisionmaking.

### c. Aerial Refueling

Appellants claim that the EIS's noise impacts analysis failed to take into account the effect of aerial refueling operations. Appellants seem to suggest that the EIS should have addressed the impact of aerial refueling separately from its overall noise analysis. However, according to the U.S. Air Force, overflights of aircraft engaged in aerial refueling were incorporated in the calculations of $L_{dnmr}$ levels, making an independent analysis unnecessary. We have no basis for contesting the U.S. Air Force's assertion, especially given the fact that the EIS openly describes aerial refueling training as one of the activities in which German Air Force aircrews would be engaged. Appellants' App. at 98. Having already upheld the EIS's use of the $L_{dnmr}$ metric, we reject this additional challenge to the EIS's noise analysis.

### d. Impacts on Livestock

Appellants argue that the U.S. Air Force should have "conduct[ed] a contemporary study" of the impact of low-altitude flights on livestock because the studies cited in the EIS were outdated and insufficient. Appellants' Br. at 33. Appellants cite anecdotal evidence, presented in the public hearings, which they claim demonstrates that low-altitude flights at Holloman have on occasion already caused significant disturbance to livestock.

We are unpersuaded that the U.S. Air Force was required to carry out its own study regarding the impact of low-level overflights on livestock. We have recognized that agencies must use the "best available scientific information" when assessing environmental impacts. Custer County, 256 F.3d at 1034. It appears that the U.S. Air Force has done so here. Appendix J of the EIS cites studies, dating from 1960 to 1996, reporting that livestock may run, buck, or be startled by sudden high (75 to 100 dB) noise levels but that livestock can adapt to regularly-occurring noise at such levels. Some of the studies suggested that low-level overflights produced a greater effect than sonic booms, and that the impact may be greater on gestating animals. The U.S. Air Force acknowledges that the number of studies addressing the effect of noise on livestock is small. However, we have no reason to believe that the studies' conclusions are inaccurate, particularly in light of other studies, also discussed in Appendix J, which reach the same conclusion in regard to bighorn sheep, bison, elk, deer, and antelope. See Appellants' App. at 202.

Appellants cite public hearing testimony that a horse startled by an overflight knocked over the person shoeing him and that a horse owner suspected that overflights were responsible for the deaths of a number of horses who ran over a fence at night. In response to such testimony, the U.S. Air Force expanded the EIS's Appendix J and acknowledged that low-level overflights "may or may

not lead to livestock damage." Id. at 292.  Appellants argue that, based on one person's testimony that overflights had harmed her ostriches, the final EIS should have cited an "army discussion" of claims submitted to the military for damage to ostriches from overflights.  Appellants' Br. at 32.  However, as the U.S. Air Force points out, this testimony was given by someone who lived in the vicinity of Cannon Air Force Base, not Holloman, and there is no indication any of the affected landowners around Holloman have ostriches.  We conclude that the EIS's discussion of livestock impacts was sufficient.

### e.  Impacts of Aircraft Accidents

Appellants point to a 2002 Tornado crash near Alamagordo, which sparked a forest fire, as an indication that the EIS was inadequate for failing to discuss the environmental and economic impacts of such a fire.  Appellants suggest that a supplemental EIS was needed to address these impacts in light of the dry weather predicted for 2003.  We believe the U.S. Air Force adequately addressed the risk of accident in its EIS and was not required to prepare a supplemental EIS under these circumstances.  The EIS acknowledged the risk of accident, described its methodology for calculating this risk, and described the results of these calculations.  The fact that an accident has since occurred does not indicate that the EIS's analysis was flawed, nor does it make necessary further discussion of

the secondary effects of such an accident in a supplemental EIS. "Even as to impacts that are . . . reasonably foreseeable and merit inclusion [in an EIS], the []EIS need only furnish such information as appears to be reasonably necessary under the circumstances for evaluation of the project." Utahns for Better Transp., 305 F.3d at 1176. The EIS acknowledges that "fire and environmental contamination" may result from a crash and that this possibility is more likely for crashes in "highly vegetated areas during a hot, dry summer." Appellees' Supp. App. at 111. Having concluded that the risk of accident was relatively low, it was not required to describe the potential consequences of a resulting fire in further detail.

### B. Case-Zablocki Claim

Appellants argue that the U.S. Air Force should have submitted its Agreement with the German Air Force to the Secretary of State for approval, as required for "international agreements" under the Case-Zablocki Act, 1 U.S.C. § 112b(c). As indicated above, the district court dismissed Appellants' claims in regard to the Case-Zablocki Act for lack of standing. We review questions of standing de novo. Kansas v. United States, 249 F.3d 1213, 1222 (10th Cir. 2001).

According to Appellants, the district court improperly characterized their argument regarding the U.S. Air Force's failure to comply with the Case-Zablocki

Act. They state that they "do not assert an independent cause of action requiring standing under Case-Zablocki, but sought to make the district court aware that without a properly concluded International Agreement, there was no legal basis for the final NEPA analysis and ultimate ROD." Appellants' Br. at 55. Appellants cite no authority, nor have we discovered any, for their apparent suggestion that NEPA and its regulations require a reviewing court to consider whether an agency has a "legal basis" for the proposed action that triggered NEPA's requirements. Appellants' further contention that consultation with the Secretary of State would have allowed the Secretary to reject the Agreement and was thus properly "part of the consideration of suitable alternatives" under NEPA is without merit.

Moreover, we agree with the district court that the Case-Zablocki Act itself creates no private right of action and that Appellants have no standing to challenge the U.S. Air Force's alleged violation of the Act under the APA. Assertion of a private right of action is clearly precluded by the Act's implementing regulation, which states that "[d]eviation or derogation from the provisions of [the Act] will not affect the legal validity . . . of agreements concluded, will not give rise to a cause of action and will not affect any public or private rights established by such agreements." 22 C.F.R. § 181.1(b).

In order to have standing to challenge a violation of the Case-Zablocki Act under the APA, Appellants would have to establish that they have suffered an injury that "falls within the 'zone of interests' sought to be protected" by the Act. Mount Evans Co. v. Madigan, 14 F.3d 1444, 1452 (10th Cir. 1994) (internal quotation marks omitted). "'The essential inquiry is whether Congress intended for a particular class of plaintiffs to be relied upon to challenge agency disregard of the law.'" Hernandez-Avalos v. INS, 50 F.3d 842, 847 (10th Cir. 1995) (quoting Mount Evans Co., 14 F.3d at 1452). The Case-Zablocki Act is evidently meant to mediate between the foreign relations powers of Congress and the President. See Dames & Moore v. Regan, 453 U.S. 654, 682 n.10 (1981). Congress clearly did not intend for any private individual to enforce the Act's provisions.

Having determined that Appellants have no standing to enforce the Case-Zablocki Act, we need not consider whether the Agreement did in fact constitute an international agreement subject to the Act's procedural requirements.

## CONCLUSION

For the foregoing reasons, the decision of the district court is AFFIRMED.