FILED
United States Court of Appeals
Tenth Circuit

November 5, 2018

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

AUDUBON SOCIETY OF GREATER
DENVER,

     Petitioner - Appellant,

v.

UNITED STATES ARMY CORPS OF
ENGINEERS,

     Respondent - Appellee,

and

CASTLE PINES METROPOLITAN
DISTRICT; CASTLE PINES NORTH
METROPOLITAN DISTRICT;
CENTENNIAL WATER AND
SANITATION DISTRICT; CENTER OF
COLORADO WATER CONSERVANCY
DISTRICT; CENTRAL COLORADO
WATER CONSERVANCY DISTRICT;
TOWN OF CASTLE ROCK;
COLORADO DEPARTMENT OF
NATURAL RESOURCES,

     Intervenors Respondents - Appellees.

No. 18-1004

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:14-CV-02749-PAB)**
_____

Kevin Lynch, Environmental Law Clinic, University of Denver, Sturm College of Law,
Denver, Colorado, appearing for Appellant.

Sommer H. Engels, Attorney, Environment and Natural Resources Division, United States Department of Justice, Washington, DC (Jeffrey H. Wood, Acting Assistant Attorney General, United States Department of Justice, Washington, DC; Eric Grant, Deputy Assistant Attorney General, United States Department of Justice, Washington, DC; Jennifer Scheller Neumann, Michael Gray, Phillip R. Dupre, Dustin J. Maghamfar, Attorneys, Environment and Natural Resources Division, United States Department of Justice, Washington, DC; Catherine E. Grow, Of Counsel, Office of Counsel, United States Army Corps of Engineers, Omaha District, Omaha, Nebraska; Daniel Inkelas, Of Counsel, Office of the Chief Counsel, United States Army Corps of Engineers, with her on the brief), appearing for Appellee United States Army Corps of Engineers.

Cynthia H. Coffman, Attorney General, Denver, Colorado, and Scott Steinbrecher, Assistant Solicitor General, Denver, Colorado, on the brief for Appellee Colorado Department of Natural Resources.

Bennett W. Raley, Deborah L. Freeman, William Davis Wert, and Trout Raley, Denver, Colorado, on the brief for Appellees Castle Pines Metropolitan District, Castle Pines North Metropolitan District, Centennial Water and Sanitation District, Center of Colorado Water Conservancy District, Central Colorado Water Conservancy District, and Town Of Castle Rock.

_____

Before **BRISCOE**, **LUCERO**, and **MATHESON**, Circuit Judges.

_____

**BRISCOE**, Circuit Judge.

_____

This is an Administrative Procedure Act challenge to the Army Corps of Engineers' approval of a project to store more water in the Chatfield Reservoir in Colorado. Petitioner Audubon Society of Greater Denver sought review of the Corps' decision, arguing that the Corps' review and approval of the project failed to comply with the National Environmental Policy Act, 42 U.S.C. §§ 4321–4370m-12, and the Clean Water Act, 33 U.S.C. §§ 1251–1388. The district court denied the petition for review after concluding that the Corps' decision was not arbitrary or capricious. Audubon also

2

moved to supplement the administrative record. The district court denied the motion because it found that the administrative record sufficiently informed the Corps' analysis. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we AFFIRM.

**I**

**A.      Statutory Background**

In this case, we must decide whether the Corps complied with NEPA and the CWA when it approved the Chatfield Storage Reallocation Project, which will allow certain water providers in the Denver metropolitan area to store 20,600 acre-feet of water in the Chatfield Reservoir. "In NEPA, Congress codified rules designed to focus both agency and public attention on the environmental effects of proposed actions and thereby facilitate informed decisionmaking by agencies and allow the political process to check those decisions." *WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 784 F.3d 677, 690 (10th Cir. 2015) (quotation marks and alteration omitted). "NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

NEPA requires the Corps to "include" an Environmental Impact Statement "in every recommendation or report on proposals for . . . major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). An EIS "provide[s] full and fair discussion of significant environmental impacts and . . . inform[s] decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."

3

40 C.F.R. § 1502.1. At issue in this appeal is whether the Corps adequately addressed and discussed the identified reasonable alternatives.

The discussion of alternatives "is the heart of the" EIS. *Id.* § 1502.14. "[I]t should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." *Id.* The Corps was required to:

> (a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.
>
> (b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.
>
> (c) Include reasonable alternatives not within the jurisdiction of the lead agency.
>
> (d) Include the alternative of no action.
>
> (e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.
>
> (f) Include appropriate mitigation measures not already included in the proposed action or alternatives.

*Id.* As long as "the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson*, 490 U.S. at 350. "Other statutes may impose substantive environmental obligations on federal agencies, but NEPA merely

prohibits uninformed—rather than unwise—agency action." *Id.* at 351 (footnote omitted).

Unlike NEPA, which focuses on process, the CWA imposes substantive requirements on the Corps. *Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1166 (10th Cir. 2012). With certain exceptions, the CWA prohibits the "discharge of dredged or fill material into the" "waters of the United States." 33 U.S.C. §§ 1311(a), 1344(a), 1362(7). But the Corps "may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites." *Id.* § 1344(a). This permitting process is governed by the Section 404(b)(1) Guidelines, which are contained in Part 230 of Title 40 of the Code of Federal Regulations. 40 C.F.R. §§ 230.1–230.98. When the Corps decides whether it may itself "discharge[] . . . dredged material or fill material," it does not issue a permit, "but does apply the 404(b)(1) [G]uidelines and other substantive requirements of the CWA and other environmental laws." 33 C.F.R. § 335.2.

The 404(b)(1) Guidelines state that "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). "An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." *Id.* § 230.10(a)(2). In other words, the Corps may authorize a proposed discharge when it

is the least environmentally damaging practicable alternative ("LEDPA"). *Id.* § 230.10(a).

## B. Factual Background

In 1973, the Corps constructed the Chatfield Reservoir by erecting a dam across the South Platte River southwest of Denver. PAA0643. The Reservoir was primarily built for flood control, but Congress also authorized the Corps to develop recreational facilities at the Reservoir. PAA0643–44. In 1974, the Corps leased the land surrounding the Reservoir to the State of Colorado, which opens the area to the public as Chatfield State Park. PAA0644. Chatfield State Park is currently one of the most popular state parks in Colorado. PAA0628–29.

In 1986, Congress authorized the Corps to study whether it would be feasible and economically justifiable to reallocate part of Chatfield Reservoir's storage capacity from flood control to municipal, industrial, and agricultural water storage. *See* Water Resource Development Act of 1986, Pub. L. No. 99-662, § 808, 100 Stat. 4082, 4186. The resulting study predicted that, even taking into account water conservation programs, water providers will need approximately 50% more water in 2050 because of population growth in the Denver metropolitan area. PAA0629–30, 0656, 0658. Under current conditions, absent the development of additional water supply, the Denver metropolitan area will have "approximately 90,000 acre-feet of unmet [water] needs" in 2050. PAA0658. In 2009, Congress "authorized . . . modifications of the . . . [Chatfield] Reservoir, . . . and any required mitigation," to accommodate water storage. Omnibus Appropriations Act of 2009, Pub. L. No. 111-8, § 116, 123 Stat. 524, 608.

6

Following additional study, a group of water providers who supply water to municipal, industrial, and agricultural users in the Denver metropolitan area proposed the Reallocation Project at issue in this appeal. PAA0665. The Reallocation Project allows the water providers to store 20,600 acre-feet of water in Chatfield Reservoir. PAA0665. The immediate practical effect of the Reallocation Project is that the maximum water level in the Reservoir will rise by 12 feet, flooding 587 acres of Chatfield State Park. PAA0764. The flooded area includes various recreation facilities and sensitive environments. PAA0765, 0827–30. Because of these effects, the water providers also proposed two plans—one to relocate the recreation facilities and the other to mitigate environmental damage. PAA0828–40. As proposed, the recreation relocation and environmental mitigation plans involved the discharge of dredged and fill material into wetlands near Chatfield Reservoir.[1] PAA0840.

As part of its review of the Reallocation Project, the Corps prepared an Environmental Impact Statement. PAA0627. The EIS states that "the main problem" addressed by the Reallocation Project is the "increasing water demand in the Denver Metro area that exceeds available water supplies." PAA0628. Accordingly,

> [t]he purpose and need [of the Reallocation Project] is to increase availability of water, providing an additional average year yield of up to approximately 8,539 acre-feet of municipal and industrial . . . water, sustainable over the 50-year period of analysis, in the greater Denver Metro area so that a larger proportion of existing and future water needs can be met.

---

[1] Fill material, which would be deposited in certain areas of wetlands around Chatfield Reservoir to raise parts of the shoreline above the new high water line, would be excavated from five sites around Chatfield State Park. PAA1083-87.

PAA0628.  The Corps also noted that any version of the Reallocation Project ultimately approved would need to comply with the CWA, mitigate any environmental damage caused by the Reallocation Project, and preserve recreation opportunities for Chatfield State Park visitors.  PAA0662–63.

The Corps initially examined thirty-eight alternatives for securing additional water supply for the Denver metropolitan area.  PAA0667.  These strategies fell into seven categories: increased water conservation, agricultural transfers, importation of water, development of new water storage facilities, storage of additional water at existing reservoirs, increased use of surface water and groundwater, and increased water recycling.[2]  PAA0667–71.  The Corps used four criteria to compare these potential alternatives: "[a]bility to meet purpose and need," "[c]ost," "[l]ogistics and technology," and "[e]nvironmental impacts (including significance and ability to mitigate)." PAA0633–34.  After its initial analysis, the Corps concluded that some of the original thirty-eight alternatives did not warrant further study.  Among those alternatives abandoned by the Corps were increased water conservation, development of gravel pit storage upstream from Chatfield Reservoir, and the purchase of water storage capacity at the Rueter-Hess Reservoir.  PAA0673, 0689.  After briefly explaining its decision not to further analyze thirty-four alternatives, the Corps considered the remaining four alternatives in detail.

---

[2] The surface water would be captured from above-ground streams or rivers, PAA0682, and groundwater would be pumped from underground aquifers, PAA0743-44.

First, the Corps considered Alternative 1, the "No Action Alternative," which meant the Reallocation Project would not proceed and water providers would have to look to other options to secure additional water. PAA0693. "The main feature of the No Action Alternative is the development of other alternative surface storage units to contain surface water supplies of the same approximate yield of the Chatfield Reservoir storage reallocation project." PAA0693. Specifically, the No Action Alternative assumed that the water providers would store surface water in a newly-constructed Penley Reservoir and downstream gravel pits. PAA0693.

The Corps next considered Alternative 2, in which the water providers would meet future demand using groundwater and surface water stored in downstream gravel pits. PAA0714–15. The gravel pits in Alternative 2 would be developed in the same way as in Alternative 1. PAA0715. But in Alternative 2, instead of building Penley Reservoir, the water providers would also rely on groundwater to serve their customers. PAA0715.

The Corps then evaluated Alternative 3, which is the Reallocation Project that was ultimately selected. PAA0715–16. Under Alternative 3, the water providers could store 20,600 acre-feet of water in Chatfield Reservoir. PAA0715. Increasing the amount of water in Chatfield Reservoir would raise the water level by 12 feet. PAA0715. "No new infrastructure would be needed at Chatfield by any water provider." PAA0716.

Finally, the Corps examined Alternative 4, which would allow water providers to store 7,700 acre-feet of water in Chatfield Reservoir. PAA0716–17. Alternative 4 would increase the water level in the reservoir by five feet. PAA0717. To meet additional demand, the water providers would also rely on groundwater and surface water stored in

downstream gravel pits (again developed in the same way as in Alternative 1). PAA0717.

After comparing these four alternatives, the Corps chose Alternative 3. PAA0819. The Corps concluded that "Alternative 3 maximizes [National Economic Development] benefits" by "minimiz[ing] the cost of supplying water" and "best meets the water supply needs of the water providers." PAA0819. The Corps also concluded that

> Alternative 3 is . . . the Least Environmentally Damaging alternative because: 1) the environmental impacts of Alternative 3 at Chatfield can all be fully mitigated; 2) Alternative 3 does not result in the drying up of any farmland or include the use of non-renewable [groundwater]; and 3) Alternative 3 is the plan most consistent with the Corps' seven [Environmental Operating Principles].

PAA0819.

While conducting the NEPA analysis, the Corps remained mindful that the alternative ultimately chosen would need to comply with the CWA. PAA0663. Alternative 3 includes "the modification of recreation facilities and certain environmental mitigation activities [that] would involve the discharge of dredge and fill material into waters of the United States, including wetlands." PAA0840. "These discharge activities would involve an estimated temporary impact to about 5.5 acres of wetlands and a loss of about 6.9 acres of wetlands." *Id.* In the Corps' opinion, the "[c]umulative impacts of the proposed dredge and fill activities on the aquatic ecosystem are expected to be small." PAA0842.

The Corps also appended a separate analysis of the dredge and fill discharge associated with the Reallocation Project. PAA1072–1101. As part of that analysis, the

10

Corps considered whether it could relocate the recreation facilities and mitigate environmental damage without discharging dredge or fill. PAA1094, 1097. The Corps concluded that, while it was possible to avoid discharging dredge or fill, doing so "would result in a greater area of net disturbance and environmental impact," PAA1095; prevent the Corps from fully replacing the recreational facilities affected by plan; and "complicate the construction, maintenance, and reliability of the [environmental] mitigation," PAA1098. Because of these complications, the Corps instead modified the recreation relocation and environmental mitigation plans to "avoid[] and minimize[] the discharge of fill material . . . to the maximum extent practicable while still meeting the objective[s] of providing recreation facilities that maintain the existing recreational experience," PAA1097, and "fully mitigating the [environmental] impacts," PAA1098.

In May 2014, the Corps issued its Record of Decision approving the Reallocation Project. PAA1144–45. In October 2014, Audubon sought review of the Corps' decision. The Colorado Department of Natural Resources and the water providers who seek to store water in Chatfield Reservoir intervened in support of the Corps' decision. PAA0006. Audubon moved to supplement the administrative record. PAA0131–54. The district court denied the motion because it found that the administrative record was sufficient for the Corps' analysis. PAA0277–88. In December 2017, the district court concluded that the Corps did not act arbitrarily or capriciously when approving the Reallocation Project and affirmed the Corps' decision. PAA0500–38. Audubon timely filed a notice of appeal. PAA0543–45.

11

Audubon then moved in this Court for an injunction pending appeal because the Corps has already begun to implement the Reallocation Project. The motion was denied. Audubon subsequently filed a motion to expedite consideration of this appeal because of the ongoing construction at Chatfield Reservoir. The motion was denied as premature because the appeal was not yet fully briefed. After filing its reply brief, Audubon again moved for expedited consideration. The motion was denied insofar as it sought a special sitting to hear the appeal, and deferred insofar as it sought expedited consideration after oral argument.

## II

Audubon challenges the Corps' compliance with NEPA and the CWA. We review the district court's decision de novo and "the Corps' compliance with NEPA and the CWA pursuant to the Administrative Procedure Act." *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1268 (10th Cir. 2004). Under the APA, we will not set aside the Corps' decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The APA's arbitrary and capricious standard is a deferential one; administrative determinations may be set aside only for substantial procedural or substantive reasons, and the court cannot substitute its judgment for that of the agency." *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1164 (10th Cir. 2002).

## A.     NEPA

NEPA requires the Corps to prepare an EIS for a "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

When an agency prepares an EIS, it must "[r]igorously explore and objectively evaluate all reasonable alternatives" to the project. 40 C.F.R. § 1502.14(a). But "[a] rule of reason applies to an . . . agency's choice of alternatives to include in its analysis." *WildEarth Guardians v. Nat'l Park Serv.*, 703 F.3d 1178, 1183 (10th Cir. 2013) (quotation marks omitted).

"[A]gencies are not required to consider alternatives they have in good faith rejected as too remote, speculative, or impractical or ineffective." *Id.* (quotation marks and ellipsis omitted). "Alternatives that do not accomplish the purpose of an action are not reasonable, and need not be studied in detail by the agency." *Id.* (quotation marks omitted). Moreover, "an agency has wide discretion in defining its objectives and in determining which alternatives meet those objectives." *W. Watersheds Project v. Bureau of Land Mgmt.*, 721 F.3d 1264, 1275–76 (10th Cir. 2013). When an agency decides to exclude an alternative from detailed study, it only needs to "'briefly discuss the reasons' for eliminating [the] unreasonable alternative[] from [the] EIS." *WildEarth*, 703 F.3d at 1183 (quoting 40 C.F.R. § 1502.14(a)).

Audubon argues that the Corps dismissed three alternatives without sufficient explanation.[3] Aplt. Br. 44. Specifically, Audubon faults the Corps for failing to examine

---

[3] At oral argument, Audubon also argued that the Reallocation Project does not increase water supply for the Denver metropolitan area because the Reallocation Project has "zero dependable yield." Because this issue was not briefed by the parties, we asked them to file notices of supplemental authority pursuant to Federal Rule of Appellate Procedure 28(j). In the EIS, the Corps acknowledged that, under the Reallocation project, the water providers will store varying amounts of water from year to year because the water providers have relatively junior water rights. PAA0973, 1069. The water providers will store less in drought years and more in years when water is abundant. But these

13

"[e]nhanced water conservation measures," which "go beyond the standard methods already being used by water providers." Aplt. Br. 45–50. Audubon also maintains that the Corps erred when it excluded upstream gravel pits from further consideration because they offered sufficient capacity for the Reallocation Project. Aplt. Br. 50–53. Finally, Audubon asserts that the water providers could have purchased storage capacity at the Rueter-Hess Reservoir instead of expanding the Chatfield Reservoir. Aplt. Br. 53–55. We hold that the Corps' decision not to further analyze these three alternatives was not arbitrary or capricious.

First, the Corps considered increased water conservation at length and concluded that "water conservation is not an equivalent practicable alternative to the proposed project" because the "shortages of sustainable water supplies faced by the water providers will not be resolved by water conservation measures alone." PAA0674. Instead, the Corps' subsequent analyses assumed that "[c]urrent water conservation practices constitute an independent parallel action" to the Reallocation Project. PAA0679. As the Corps explained in response to a public comment, "[w]ater conservation goals and amounts were considered when determining the amount of water needed for future use."

_____

fluctuations are not caused by the Reallocation Project, but by the natural cycle of drought. As the Corps explained, "[b]ecause gravel pit or reservoir storage relies on junior surface water rights, the water supply for all alternatives, to some degree, would be unreliable during dry periods." PAA0813. The Corps also explained that Chatfield Reservoir is an attractive storage option because it sits on the South Platte River and can effectively capture excess water without new facilities. PAA0973. Therefore, Audubon has less raised a problem with the Reallocation Project than noted the challenge faced by water suppliers as they attempt to serve the growing needs of the Denver metropolitan area with erratic surface water availability.

PAA0971. Therefore, the Corps "view[ed] each alternative [discussed in the EIS] as also including the various conservation programs as components." PAA0971.

The Corps concluded that, while "conservation can delay the timing of the need for additional supplies," "it does not in itself eliminate the need for additional supplies." PAA0673. Contrary to Audubon's suggestion, Aplt. Br. 46–50, *Davis v. Mineta*, 302 F.3d 1104, 1122 (10th Cir. 2002), *abrogated on other grounds by Dine Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276 (10th Cir. 2016), does not indicate that the Corp's analysis was inadequate. In *Davis*, the agency's NEPA analysis was deficient because it "summarily rejected" alternatives that could not, "standing alone," achieve the project's goals. 302 F.3d at 1120. The Department of Transportation made "no effort" to consider whether these alternatives, when analyzed "in conjunction" with each other, could achieve the project goals. *Id.* at 1121. The Corps' analysis here is far more extensive. The Corps thoroughly described the current status of the water providers' conservation plans and explained that, because the future unmet water need is so great, the water providers will "develop even more stringent water conservation measures," even after the Reallocation Project is completed. PAA0673–0679, 0944–0961. This discussion sufficiently explained why the Corps did not consider enhanced water conservation to be a reasonable alternative worthy of further analysis, which is all that NEPA requires. *See WildEarth*, 703 F.3d at 1183–87.

Second, the Corps adequately explained why upstream gravel pits did not merit further discussion. Upstream gravel pits were "eliminated from further consideration due to limited storage capacity and the logistical difficulties of combining reservoirs to meet

15

the storage requirements of the project." PAA0683. The upstream gravel pits had 5,490 acre-feet of capacity spread across three reservoirs, which was less than the 8,539 acre-feet sought by the Reallocation Project. PAA0669. On the other hand, downstream gravel pits, which the Corps did analyze at length, would have provided 7,835 acre-feet of storage and presented fewer logistical complications. PAA0700. Compared to the upstream gravel pits, the downstream gravel pits were closer to "existing water supply system[s]," which "minimize[d] connection costs" for the water suppliers. PAA0700. Given that the upstream and downstream gravel pits were similar alternatives, but the downstream option offered more storage at a lower cost, the Corps' decision to exclude upstream gravel pits as an alternative was neither arbitrary nor capricious. *Prairie Band Pottawatomie Nation v. Fed. Highway Admin.*, 684 F.3d 1002, 1011 (10th Cir. 2012) ("[A]n agency need not consider an alternative unless it is significantly distinguishable from the alternatives already considered." (quotation marks omitted)).

Notwithstanding the Corps' reasoning, Audubon urges us to conclude that the Corps' analysis was arbitrary and capricious because, after the Corps finalized the EIS, an upstream gravel pit owner informed the Corps that a "preliminary" report showed that the pit could "hav[e] the capacity for 11,000 acre-feet of storage when expanded." PAA1105. This new information does not render the Corps' decision arbitrary or capricious because the information was not provided to the Corps until after the final EIS was issued. *Prairie Band*, 684 F.3d at 1012–13.

Third, the Corps sufficiently explained why storing water at the Rueter-Hess Reservoir was not a viable alternative to the Reallocation Project. The Corps observed

that the Rueter-Hess "[w]ater allocation [had been] subscribed and permitted under a separate planning action" carried out by the Corps. PAA0670. The Corps further noted that several water providers already owned the "storage capacity" at the Rueter-Hess Reservoir. PAA0670. Though the Rueter-Hess Reservoir had recently been expanded, the capacity was "anticipated to primarily meet the needs of" the current storage owners, who "ha[d] not made any additional [storage] capacity available for sale" since 2012. PAA0684. The Corps explained that storing additional water at Rueter-Hess was not a practicable alternative because there was no available storage in that reservoir. This analysis was not arbitrary or capricious.[4] *See WildEarth*, 703 F.3d at 1183–87.

## B. CWA

The CWA authorizes the Corps to "issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a). Regulations implementing the CWA state that "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). "An alternative is practicable if it

---

[4] Audubon asks that we take judicial notice of the Parker Water and Sanitation District's website for "the fact that, at this time, Rueter-Hess Reservoir is only 1/3 full." Aplt. Reply Br. at 26 n.10. Even if the accuracy of this statement was sufficiently certain to warrant our taking judicial notice of it, the statement does not speak to the question of whether any of the storage capacity in the Reservoir is for sale.

17

is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes."[5] *Id.* § 230.10(a)(2).

The Corps interpreted the phrase "practicable alternative to the proposed discharge" to limit the scope of its CWA alternatives analysis to those portions of the Reallocation Project that caused the discharge of dredge and fill.[6] Aple. Br. 27. The Corps reasoned that the entire Reallocation Project could be accomplished without the discharge of dredge and fill because (1) increasing the water level in Chatfield Reservoir causes no discharge and (2) it was possible to "totally avoid all discharge of fill material" when relocating the recreation facilities and mitigating environmental damage. PAA1074, 1095. But when the water providers actually proposed the recreation relocation and environmental mitigation plans, each plan called for the discharge of dredge and fill. PAA1094–98. Because the Corps did not consider these proposed discharges to be integral to the Reallocation Project—i.e., the Corps could have approved

---

[5] "Where the activity associated with a discharge [into] . . . a special aquatic site . . . does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose (i.e., is not water dependent), practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise." 40 C.F.R. § 230.10(a)(3). Wetlands are a special aquatic site. *Id.* § 230.41. No party discusses whether the § 230.10(a)(3) presumption applies in this case, and it does not appear that the Corps explicitly determined whether the recreation relocation and environmental mitigation plans were water dependent. The district court noted this issue and concluded that the presumption was "not at issue" in this case. PAA0530.

[6] During the preparation of the EIS, there was debate within the Corps and with the Environmental Protection Agency about whether the Corps had adopted the correct interpretation of 40 C.F.R. § 230.10(a). PAA1056–66, 1152–1153, 1157–1164. After further discussion, the EPA became "comfortable with the approach taken by the Corps in the preliminary draft CWA § 404(b)(1) analysis." PAA1066. Because we "are empowered to review only an agency's *final* action," this internal debate does not render the Corp's ultimate interpretation arbitrary or capricious. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 659 (2007) (citing 5 U.S.C. § 704).

the Reallocation Project without allowing the discharge of dredge and fill—the Corps limited its CWA analysis to the water providers' recreation relocation and environmental mitigation plans. PAA0840–42, 1072–1101.

Audubon disagrees with the Corps' interpretation of 40 C.F.R. § 230.10(a). Audubon argues that the Corps should have used the 404(b)(1) Guidelines to compare the four NEPA alternatives to the Reallocation Project, not just the alternatives to the recreation relocation and environmental mitigation plans. Aplt. Br. 28–30. According to Audubon, the suggestion in § 230.10(a)(2) that alternatives be considered "in light of overall project purposes" means that the CWA analysis should focus on the project as a whole, not just "the proposed discharge." Aplt. Br. 28–30. Therefore, Audubon argues that the Corps improperly segmented the Reallocation Project when it analyzed alternatives to the recreation relocation and environmental mitigation plans without accounting for the environmental impacts of the rest of the Reallocation Project. Aplt. Br. 28–30.

Resolving this dispute involves two questions. *See Biodiversity Conservation All. v. Jiron*, 762 F.3d 1036, 1062–69 (10th Cir. 2014). The first asks whether the Corps correctly interpreted its own regulation. *Id.* at 1062. The second asks whether the Corps "compl[ied] with its own interpretation." *Id.* at 1069. We address each question in turn.

When deciding whether an agency correctly interpreted its own regulations, "we . . . determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Id.* at 1062 (quotation marks omitted). If so, we apply the regulation's unambiguous meaning. *Id.* But "[i]f the meaning is

19

ambiguous, we defer to [the] agency's interpretation . . . , even when that interpretation is advanced in a legal brief, unless the agency's interpretation is plainly erroneous or inconsistent with the regulation." *Id.* (quotation marks and citations omitted). "An agency's interpretation need not be the only possible reading of a regulation—or even the best one—to prevail." *Id.* (quotation marks and alteration omitted).

Section 230.10(a) does not plainly and unambiguously define the scope of the Corps' CWA analysis. Whereas § 230.10(a) is narrowly focused on "the proposed discharge," § 230.10(a)(2) instructs the Corps to take into account the "overall project purposes." The Corps proposes an interpretation of § 230.10(a) in which the scope of its CWA analysis is determined by the relationship between the overall project and the proposed discharge. Under the Corps' interpretation, when the proposed discharge is incidental to the completion of the overall project, the Corps' analysis must only address alternatives to the proposed discharge.

The Eighth and Ninth Circuits have affirmed the issuance of dredge and fill permits when the Corps employed a similar interpretation of § 230.10(a). *See Nat'l Wildlife Fed'n v. Whistler*, 27 F.3d 1341, 1345–46 (8th Cir. 1994) (reasoning that the Corps was faced with "two severable projects" where one "would proceed even without" the § 404 permit); *Sylvester v. U.S. Army Corps of Eng'rs* (*Sylvester II*), 882 F.2d 407, 410–11 (9th Cir. 1989) ("[A]n alternative site does not have to accommodate components of a project that are merely incidental to the applicant's *basic* purpose.").[7] As Audubon

---

[7] In *Sylvester*, a developer planned to build a resort on uplands and a golf course on wetlands. *Sylvester II*, 882 F.2d at 410–11. "The Corps believed that it had jurisdiction

20

notes, the Corps' interpretation of § 230.10(a) could incentivize permit applicants to improperly segment their projects to minimize apparent environmental damage. Aplt. Br. 32–34. But we have previously addressed similar concerns by explaining that the Corps can only consider an applicant's "legitimate" objectives when defining the scope of its CWA analysis. *Greater Yellowstone*, 359 F.3d at 1269–70 (citing *Sylvester II*, 882 F.2d at 409, and *Whistler*, 27 F.3d at 1346). "[A]n applicant cannot define a project in order to preclude the existence of any alternative sites and thus make what is practicable appear impracticable."[8] *Whistler*, 27 F.3d at 1346 (quoting *Sylvester II*, 882 F.2d at 409).

---

only over the wetlands and, accordingly, confined its review to the meadow where [the developer] intend[ed] to locate the golf course." *Sylvester v. U.S. Army Corps of Eng'rs* (*Sylvester I*), 884 F.2d 394, 396 (9th Cir. 1989). In *Whistler*, a developer planned to build a housing development on uplands and provide water access to the development by dredging wetlands. 27 F.3d at 1345–46. The Corps analyzed the two components of the project separately because "the planned housing development site was located on uplands and therefore could proceed without a permit." *Id.* at 1345.

[8] Without citing any authority, Audubon suggests that the Corps should apply NEPA's anti-segmentation rule to its CWA analyses. Aplt. Br. 32–34. The anti-segmentation rule is designed "to prevent agencies from minimizing the potential environmental consequences of a proposed action (and thus short-circuiting NEPA review) by segmenting or isolating an individual action that, by itself, may not have a significant environmental impact." *Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1028 (10th Cir. 2002). But, as discussed previously, NEPA and the CWA have distinct analytical frameworks. *See Hillsdale*, 702 F.3d at 1165–66 (comparing an agency's obligations under NEPA and the CWA). Audubon argues that the same policy considerations motivate NEPA and the CWA, but this argument does not address the fact that Congress enacted two statutes, each with its own unique procedure. *See Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1239 (10th Cir. 2011) ("To impose upon the agency more stringent requirements than the legal framework requires, absent extremely compelling circumstances, would violate the well-settled principle articulated by the Supreme Court in *Vermont Yankee* that the formulation of procedure is to be basically left within the discretion of the agencies to which Congress has confined the responsibility for substantive judgments." (quotation marks omitted) (referring to *Vermont Yankee Nuclear Power Plant v. Nat. Res. Def. Council*, 435 U.S. 519 (1978))).

In addition to finding support in prior case law, the Corps' interpretation of § 230.10(a) is supported by other parts of the 404(b)(1) Guidelines. The Corps is "instruct[ed] . . . to 'recognize the different levels of effort that should be associated with varying degrees of impact [from the proposed discharge] and require or prepare commensurate documentation.'" *Greater Yellowstone*, 359 F.3d at 1271 (quoting 40 C.F.R. § 230.6(b)). "The level of documentation should reflect the significance and complexity of the discharge activity." 40 C.F.R. § 230.6(b). Though the Corps must always identify the LEDPA, "the compliance evaluation procedures will vary to reflect the seriousness of the potential for adverse impacts on the aquatic ecosystems posed by specific dredged or fill material discharge activities." *Greater Yellowstone*, 359 F.3d at 1271 (quoting 40 C.F.R. § 230.10). These provisions support the Corps' interpretation of § 230.10(a) because they instruct the Corps to consider the scale of a proposed discharge when applying the 404(b)(1) Guidelines.

Other provisions of the 404(b)(1) Guidelines similarly confirm that the Corps' CWA and NEPA analyses can differ in scope. Audubon correctly argues, Aplt. Br. 42, that "the analysis of alternatives required for NEPA environmental documents[] . . . will in most cases provide the information for the evaluation of alternatives under" the 404(b)(1) Guidelines. 40 C.F.R. § 230.10(a)(4). But the Guidelines also state that, "[o]n occasion, these NEPA documents may address a broader range of alternatives than required to be considered under [the CWA] or may not have considered the alternatives in sufficient detail to respond to the requirements of" the 404(b)(1) Guidelines. *Id.*

22

Because the Corps' interpretation of § 230.10(a)—that its analysis need only address alternatives to the proposed discharge when the proposed discharge is incidental to the completion of the overall project—finds support in case law and other parts of the 404(b)(1) Guidelines, its interpretation is not "plainly erroneous or inconsistent with the regulation." *Biodiversity Conservation All.*, 762 F.3d at 1068–69. Accordingly, we now consider whether the Corps complied with its own interpretation of § 230.10(a).

We conclude that the Corps complied with § 230.10(a) because it reasonably found that it could approve the Reallocation Project without allowing the discharge of dredge and fill, PAA1095–97, such that it was appropriate for the Corps to confine its CWA analysis to the recreation relocation and environmental mitigation plans, *see Whistler*, 27 F.3d at 1345–46; *Sylvester II*, 882 F.2d at 410–11. The Corps explained in the EIS that it was "feasible" to complete the recreation relocation and environmental mitigation plans without discharging dredge and fill. PAA1095–96. As part of its analysis, the Corps explained how the plans could be amended to avoid the discharge of dredge and fill. PAA1095–96. Potential changes included moving "recreational facilities . . . farther from the reservoir," PAA1135, shortening culverts, PAA1138, and positioning "stilling basins . . . outside of wetlands," PAA1138. Audubon disputes the Corps' conclusion, but provides no reasoned basis to doubt the Corps' explanation that dredge and fill could be avoided if the recreation facilities and mitigation activities were moved farther from the wetlands. Aplt. Reply Br. 7 n.2; PAA1095–96.

Audubon does not suggest that the Corps defined the objectives of the recreation relocation and environmental modification plans to circumvent the CWA, nor is there any

indication in the record of such gamesmanship. The objectives of these plans were, respectively, "providing recreation facilities that maintain the existing recreational experience" and "fully mitigating the impacts to wetlands, riparian habitat, Preble's habitat, and bird habitat impacted by the [Reallocation] Project." PAA1097–98. The Corps repeatedly noted throughout the EIS that these were also objectives of the Reallocation Project. PAA0649, 0661, 0663. The objectives are also rooted in the Congressional authorization of the Reallocation Project. *See* § 116, 123 Stat. at 608 ("authoriz[ing] . . . modifications of the facility (Chatfield Reservoir, Colorado), and any required mitigation which results from implementation of the project"). Most importantly, the Corps' definition of the objectives did not "preclude the existence of any alternative sites and thus make what is practicable appear impracticable." *Whistler*, 27 F.3d at 1346 (quoting *Sylvester II*, 882 F.2d at 409).

Even after the Corps limited its analysis to the recreation relocation and environmental mitigation plans, it sufficiently analyzed the alternatives and identified the LEDPA. During its CWA analysis, the Corps considered the plans as originally proposed by the water providers, as well as alternatives that would have involved no discharge of dredge or fill. "While [the no discharge] approach [wa]s . . . feasible," the Corps concluded that "it would result in a greater area of net disturbance and environmental impact, and a significant reduction of the amount of desired in-kind replacement of existing recreational amenities and experiences." PAA1095. The no discharge approach was also more expensive. PAA1096. The Corps settled on a compromise alternative that

24

"would involve an estimated temporary impact to about 5.5 acres of wetlands and a loss of about 6.9 acres of wetlands." PAA0840.

As approved, the recreation relocation and environmental mitigation plans "avoid[] and minimize[] the discharge of fill material" "to the maximum extent practicable" while still achieving the Corps' objectives. PAA1097–98. The Corps explained that, as a result, the "[c]umulative impacts of the proposed dredge and fill activities on the aquatic ecosystem are expected to be small." PAA1100. According to the EIS, relocating the recreation facilities "would have little effect on the aquatic ecosystem due to limited dredge and fill footprints." PAA1100. The Corps also found that the environmental mitigation would not "impact[] . . . long-term water quality or the aquatic ecosystem" and would cause "the benefit of improved sediment erosion control." PAA1100. Moreover, the negative impacts to wetlands will themselves "be fully mitigate[d]." PAA1100. Therefore, the Corps' decision to approve the recreation relocation and environmental mitigation plans, as modified to reduce dredge and fill, was not arbitrary or capricious.

## C.    Motion to Supplement the Record

"We review a district court's determination of whether or not to exclude extra-record evidence for abuse of discretion." *Citizens for Alts. To Radioactive Dumping v. U.S. Dep't of Energy*, 485 F.3d 1091, 1096 (10th Cir. 2007). "[J]udicial review of agency action is normally restricted to the administrative record, [but] we have recognized that consideration of extra-record materials is appropriate in extremely limited circumstances, such as where the agency ignored relevant factors it should have

25

considered or considered factors left out of the formal record." *Lee v. U.S. Air Force*, 354 F.3d 1229, 1242 (10th Cir. 2004) (quotation marks omitted). "[W]here, as is often the case in the NEPA context, we are faced with an agency's technical or scientific analysis, an initial examination of the extra-record evidence . . . may illuminate whether an EIS has neglected to mention a serious environmental consequence, failed adequately to discuss some reasonable alternative, or otherwise swept stubborn problems or serious criticism under the rug." *Id.* (quotation marks and alteration omitted).

Audubon argues that the district court abused its discretion by denying the motion to supplement the record because the administrative "record lacks documentation required to determine if the Corps' dismissal of Rueter-Hess Reservoir and enhanced water conservation measures . . . was justified." Aplt. Br. 57. Audubon claims that consideration of a water conservation survey was necessary for the Corps to determine whether enhanced water conservation was a viable alternative to the Reallocation Project. Aplt. Br. 58 (referring to PAA0201). Audubon also claims that a report on a water recycling program (Project WISE) was necessary for the Corps to properly evaluate the viability of storing additional water in the Rueter-Hess Reservoir. Aplt. Br. 59–61 (referring to PAA0225–41).

The district court denied Audubon's motion because neither the survey of water conservation efforts nor the Project WISE information indicated that the Corps' NEPA analysis was deficient. PAA0284–87. The district court reasoned that water conservation efforts, including potential efforts to enhance water conservation in the future, were extensively discussed in the EIS. PAA0285–87. The district court also

26

explained that the summary of Project WISE was addressed in the NEPA alternatives analysis when the Corps stated that Rueter-Hess did not have any storage capacity for sale and that Project WISE was an independent effort to increase water supply in the Denver metropolitan area.  PAA0284–85, 0671, 0685, 0688.

The district court did not abuse its discretion in denying Audubon's motion to supplement the record.  Rather, it correctly noted that the EIS already incorporated sufficient information about water conservation in Colorado and the impact of Project WISE on regional water supply.  Therefore, the extra record evidence would not have filled "gaps" or addressed "inadequacies" in the Corps' analysis.  *Lee*, 354 F.3d at 1242.

**III**

Because the Corps' approval of the Reallocation Project was neither arbitrary nor capricious, and the district court's denial of Audubon's motion to supplement the record was not an abuse of discretion, we AFFIRM.  Audubon's motion for an expedited decision is DENIED as moot.